# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LINDA ANDLER,

       Plaintiff,

v.                                          CV 13-0296 KG/WPL

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security Administration,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Linda Andler protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments on May 6, 2009. (Administrative Record ("AR") 13, 144.) She alleged that she had been disabled from December 16, 2008, due to hepatitis C, depression, and vision problems. (AR 149.) Administrative Law Judge ("ALJ") Donna Montano held a hearing on her applications on July 27, 2011. (AR 34.) She determined that Andler was not under a disability as defined by the Social Security Act and therefore not entitled to benefits. (AR 27.) Andler's applications were denied. (*Id.*) Andler requested review by the Appeals Council, but that request was denied, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-3.)

Andler sought a review of the SSA's decision and filed a motion to reverse and remand for rehearing (Doc. 19; *see also* Doc. 20 (memorandum)). The Acting Commissioner of the SSA ("Commissioner") responded (Doc. 23), and Andler filed a reply (Doc. 24). Having read and

carefully considered the entire record and the relevant law, I recommend that the Court grant Andler's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, the Court must determine whether that decision is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). The Court must meticulously examine the record, but it may neither reweigh the evidence nor substitute its discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). The Court may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show [it] that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall*, 561 F.3d at 1051-52; 20 C.F.R. §§ 404.1520, 416.920 (2013). If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of her impairment

or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, she is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Andler, age fifty-four, is a high school graduate who has worked in home health care, manufacturing, and general labor positions. (AR 144, 150, 155.) She most recently worked in temporary positions as a tortilla packer and a hospital dishwasher. (AR 15.) Andler's "date last insured"—that is, the date on which her DIB coverage lapsed—was December 31, 2013. (AR 13.)

Although Andler alleged—and was found by the ALJ to suffer from—several physical impairments, both of her claims of error involve her mental RFC. Accordingly, my discussion of the medical evidence in the record will largely focus on the records relevant to Andler's mental impairments.

The earliest pertinent medical records available date to a January 2008 visit to the mental health clinic at the Albuquerque Indian Health Center. (AR 445.) The notes are abbreviated, and the provider's diagnosis is deferred, but Andler was assessed with social environmental problems, housing and economic problems, "other psychosocial and environmental problems,"

and a GAF score of fifty.[1] (*Id.*) Records of an appointment the following month with psychiatrist Joseph Luzius, M.D., show a diagnosis of a recurrent and severe major depressive disorder without psychotic features and a GAF score of fifty-five.[2] (AR 444.) Dr. Luzius saw Andler again in late February 2008, at which time he prescribed medications for several physical problems. (AR 442.)

At another visit to the Indian Health Center on March 10, 2009, Andler was examined by Scott Sunde, M.D., for pain management. (AR 440.) At the time, Dr. Sunde noted that Andler had undergone a general medical evaluation in February 2008, at which time she was assessed with hepatitis C and other physical problems, and that she had "multiple psychiatric visits" in the meantime. (*Id.*) Dr. Sunde reported that Andler was taking two prescriptions designed to treat depression and/or anxiety, Sertraline and Lorazepam, as well as a painkiller for headaches and two drugs for other ailments. (*Id.*) On March 11, 2009, Dr. Luzius noted a pleasant mood, no abnormal movements, organized thought processes, no suicidal or homicidal ideation, no hallucinations, and no notable cognitive impairment. (AR 439.)

The following day, Andler reported to the emergency room at the University of New Mexico Hospitals (UNMH), having fallen off her bicycle after feeling light-headed. (AR 235.) First responders reported that Andler was initially confused, but hospital records stated that she was lucid and appropriately oriented in transport and in the emergency room. (AR 235, 238.)

---

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, all of Andler's relevant mental health providers used this scoring method.

[2] A GAF score of fifty-one to sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Am. Psychiatric Ass'n 34.

Andler was diagnosed with a concussion and told to wear a helmet. (AR 236, 244.) It was noted that Andler had a previous medical history of depression, no history of illicit drug use, and no use of alcohol or tobacco. (AR 235.) Electrocardiograms performed that day and on April 1, 2009, returned consistent and "normal" results. (AR 233, 251-53.)

Andler applied for DIB and SSI payments on May 6, 2009. (AR 113, 122, 144.) In her disability report, Andler reported mood swings, seizures, weakness, and constant worries about death. (AR 149.) In her function report, Andler reported frequent headaches and dizziness that had caused her to fall in the shower in the past, and she mentioned difficulty sleeping. (AR 167-68.) She noted no trouble spending a couple of hours making meals every day, but she stated that she needed reminders to take medication and to make her medical appointments. (AR 169, 171.) She also said that she did not drive or cycle due to seizures she had suffered while bicycling. (AR 170-71.) Andler reported "no social activity" and an ability to pay attention for "maybe 10-20 min[ute]s," and she said that stress makes her "go into anxiety" that she needs to treat with medication. (AR 172-73.) She ended her report by noting how scared she had become since being diagnosed with hepatitis C, stating that "every day I think about if this is my last day or not." (AR 174.) A third-party function report completed by a long-time friend, who had not seen Andler since the previous year, reported that Andler's long-term depression and sleep problems and her increasingly poor health had led her to disengage from life. (AR 157-64.) She also observed that Andler got along "poorly" with authority figures and that she had been fired or laid off from two jobs for failure to follow rules and procedures and erratic behavior. (AR 163.)

Andler visited the UNMH emergency room again in late July 2009, reporting a possible seizure and a fall in the shower several days earlier. (AR 255, 269; *see* AR 436.) She told Aamr Arif Herekar, M.D., that she had experienced six seizure episodes since falling off her bicycle in

April[3] and that she remembers all of her episodes. (AR 265.) Andler's neurological status was normal when Dr. Herekar examined her, and there was "nothing pathological noted." (AR 266.) Although Andler denied alcohol or drug abuse, she admitted to smoking marijuana, and a urine toxicology screen was positive for benzodiazepine and cocaine. (AR 265, 267, 273.) Dr. Herekar opined that Andler's use of cocaine indicated that this was a "provoked seizure" and that medication would not be appropriate, and Andler was advised to refrain from cocaine use. (AR 262, 267.) Dr. Herekar also concluded that Andler's reported seizure history was "not entirely convincing" because she could remember all of her episodes and because Andler "also ha[d] multiple mood issues which also make her seizures more questionable." (*Id.*)

When Andler visited Dr. Sunde due to shoulder pain in late August 2009, he recorded her reports of "episodes of dizziness and possible loss of consciousness." (AR 436.) According to Andler, these episodes had led to several emergency room visits, but "no diagnosis was made." (*Id.*)

On September 15, 2009, Andler underwent a consultative examination by Cathy L. Simutis, Ph.D. (AR 276-78.) Andler told Dr. Simutis that she was physically abused by her mother from an earlier age until she ran away from home at age sixteen. (AR 276.) She reported outpatient treatment for marijuana abuse while on probation in Kansas in the mid-1990s, and shortly thereafter she began taking medications for depression for several years. (*Id.*) She discussed the medications she was currently taking, though she reported memory problems and believed that she was missing doses. (AR 277.) While Andler acknowledged having used cocaine while in Kansas, she denied having used it since then. (*Id.*)

Andler told Dr. Simutis that she believed that her seizures were actually panic attacks, and she reported heightened anxiety and easy startling. (AR 276-77.) She denied any suicide

---

[3] It is not clear if Andler was referring to her March 2009 bicycle crash or a discrete episode.

attempts, homicidal ideation, or inpatient psychiatric treatment, and she denied any feelings of guilt, but she said that she thinks about death every day since her father died. (*Id.*) Indeed, Andler claimed that she left her last job in July 2008 because she was having a hard time after her father's death and was unable to sleep. (AR 276.) Andler reported frequent sadness, near-daily crying, feelings of worthlessness, insomnia, fatigue, trust issues, and a lack of interest in activities she used to enjoy. (AR 277.) She claimed that she thinks too much and has trouble concentrating and making decisions. (*Id.*) She told Dr. Simutis that she has intrusive memories, but she denied having any nightmares or flashbacks. (*Id.*) Although she sometimes thought she heard someone calling her name and would become afraid, there were no indications of psychotic thought processes. (*Id.*) She said that she spends her days "laying around and watching TV" and that she had stopped reading. (*Id.*)

Dr. Simutis observed that Andler was alert, oriented, and calm, with a depressed affect and average gross intelligence, and she made note of passive suicidal ideation. (AR 277-78.) She also noted that Andler "appeared to be less than accurate at times."[4] (AR 277.) Andler was also unable to perform several number-oriented tests, but her insight and judgment appeared to be "adequate." (AR 278.) Dr. Simutis diagnosed major depressive disorder, posttraumatic stress disorder ("PTSD"), and rule-out cocaine abuse, and she described Andler's prognosis as "poor." (*Id.*) She found only mild limitations in Andler's ability to adapt to change, but she found moderate limitations in Andler's ability to understand and remember instructions, to concentrate and persist in tasks, and to interact with coworkers and the public. (*Id.*) Dr. Simutis assigned Andler a GAF score of forty-five. (AR 277.)

---

[4] The sentence as originally typed reads, "[Andler] appeared to be less than truthful at times." Someone, presumably Dr. Simutis, later scratched out the word "truthful" by hand and wrote the word "accurate" above that sentence.

On October 16, 2009, non-examining consultative psychiatrist Charles Mellon, M.D., relying on Andler's function report and records from UNMH and Dr. Simutis,[5] conducted a mental RFC assessment and psychiatric review technique. (AR 280-97.) In his narrative report, Dr. Mellon observed that Andler's function report indicated "mostly physical problems" and that Andler had described her behavioral problems as "secondary to her physical problems." (AR 296.) Dr. Mellon cited to the UNMH records only to note Andler's cocaine abuse, and he acknowledged Dr. Simutis's assignment of "only moderate limitations." (*Id.*) He determined that Andler suffered from the medically determinable impairments of major depression, PTSD, and cocaine abuse. (AR 284-93.) However, he also concluded that Andler's allegations "are only partially consistent with the available medical evidence," pointing to substance abuse and prescription drug side effects as factors. (AR 296.)

Dr. Mellon found mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no extended episodes of decompensation. (AR 294.) In his mental RFC assessment, Dr. Mellon found moderate limitations in Andler's ability to carry out detailed instructions, her ability to work in coordination with or proximity to others without distraction, and her ability to complete a normal workday without interruptions from her symptoms and perform at a consistent pace, but otherwise he found no significant limitations in Andler's ability to sustain concentration and persistence. (AR 280-81.) In his narrative functional capacity assessment, Dr. Mellon found that Andler could "understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-

---

[5] The above-referenced records from Dr. Sunde and Dr. Luzius were not provided to the SSA until after the ALJ's decision. (*See* AR 32 (listing exhibits considered by the ALJ; Exhibit 22F, featuring the relevant records, is not cited).)

workers and supervisors, and respond appropriately to changes in a routine work setting." (AR 282.)

On October 20, 2009, Janice Kando, M.D., conducted an analysis of the evidence regarding Andler's alleged physical impairments. (AR 298.) Reviewing the same records available to Dr. Mellon, Dr. Kando observed that Andler presented no evidence of end organ damage, that she did not take any medications for hepatitis, and that her liver function tests were normal. (*Id.*)[6] She also noted that Andler does not wear glasses despite citing vision problems as an impairment. (*Id.*) She therefore concluded that Andler's physical impairments were non-severe (AR 298), and the SSA reached an initial determination of nondisability the next day (AR 53-54).

Meanwhile, Andler continued to see Dr. Luzius on an outpatient basis. Notes from an October 28, 2009 session show diagnoses of recurrent moderate major depressive disorder without psychotic features and rule-out PTSD, and Dr. Luzius described Andler's situation as a "recurrence of symptoms" after Andler came off of medications and moved "back home." (AR 336.) However, Dr. Luzius stated that Andler was "stabilizing," she had reported that her medications were helping, her thought process was organized with good insight and judgment, and her cognition showed no impairment. (*Id.*) These notes were repeated on November 16, 2009, when Dr. Luzius completed a mental RFC assessment at Andler's request. (AR 335.) With respect to concentration and persistence, Dr. Luzius found marked limitations in most respects, though he found only moderate limitations in Andler's ability to understand, remember, and carry out very short and simple instructions; to sustain an ordinary routine without supervision; and to make simple work-related decisions. (AR 299-300.) Dr. Luzius also assessed mostly

---

[6] Hepatitis C is "an inflammatory process in the liver" that may cause necrosis of that organ; treatment may include medication. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 897-906 (16th ed. 1992).

marked limitations in understanding and memory and in social interaction, and he found only moderate limitations in adaptation. (*Id.*) In brief notes appended to the RFC assessment, Dr. Luzius diagnosed Andler with chronic depression, refractive to treatment, and with chronic PTSD featuring symptoms of anxiety, mood instability, and fatigue. (AR 301.)

One week later, Andler reported to Dr. Luzius that her depression had lessened with medication, she felt more stable, and she was suffering no side effects. (AR 329.) Dr. Luzius noted that Andler "tends to start and stop medications but has fair adherence once she is stable," and while he continued her current medications, he increased her Lorazepam prescription in light of the coming holiday season and the family stressors associated with that period. (*Id.*) At a follow-up appointment in December 2009, Andler again reported stress with her family, but otherwise she was doing well overall; she was getting "good sleep," her anxiety was manageable, and her depression was "in partial remission." (AR 327.) Two months later, Andler reported a more stable home life with improved family relations, good energy and sleep, well-controlled anxiety, and good function overall. (AR 325.) At each of these appointments, Dr. Luzius reported that Andler was pleasant with at least an "okay" or "pretty good" mood, organized thought processes, and good insight and judgment, and there was no sign of cognitive impairment. (AR 325, 327, 329.)

In early February 2010, Andler completed another function report with the help of her attorney. (AR 187-94.) Although this report was largely consistent with her earlier function report, Andler now claimed that she could only pay attention for "less than 1 min[ute]" due to "low attention span," and she now reported that she could not handle changes in routine well. (AR 192.) In late March 2010, after a new physical RFC assessment was conducted (AR 338-

45), Alvin Smith, Ph.D., reviewed the new and existing evidence in the record before affirming the initial denial of DIB and SSI payment (AR 55-56, 352).

At Andler's request, Dr. Luzius drafted a letter to document her current status and care on August 2, 2010. (AR 353.) There, he stated that Andler was adhering to appointments and medication and that behavioral health providers would continue to follow her to monitor her stability. (*Id.*) He also opined that Andler "will not be expected to be able to sustain employment during this time." (*Id.*)

A urine toxicology screen performed at the Indian Health Center on August 5, 2010, was positive for methadone, cocaine, and marijuana. (AR 359; *see also* AR 354.) Approximately one week later, Andler reported to UNMH complaining of severe shoulder pain. (AR 427.) Orthopedic surgeon Brook Andrew Adams, M.D., noted that Andler used "extremely slurred speech" and that she appeared to be "extremely drowsy," which she blamed on her shoulder pain keeping her awake at night. (*Id.*) X-rays showed no abnormalities, and when Dr. Adams discussed plans to schedule an MRI, Andler used profanity and demanded an immediate oxycodone prescription. (AR 428.) Dr. Adams explained that he wanted to determine the cause of her pain first, at which point Andler "replied with multiple profanities and stormed out of the clinic." (*Id.*)

In mid-September 2010, one day before undergoing an MRI, Andler visited Dr. Sunde complaining of calf cramps and requesting a Depo-Medrol injection. (AR 354.) She admitted to smoking marijuana but denied any knowledge of how methodone and cocaine could have appeared in her toxicology screen. (*Id.*) Dr. Sunde diagnosed chronic shoulder pain, hepatitis C, and polysubstance abuse, and he prescribed ibuprofen for Andler's shoulder and calf pains. (*Id.*)

At a September 20, 2010 appointment with Dr. Luzius, Andler explained her urine toxicology results by suggesting that she must have unknowingly smoked marijuana laced with cocaine and that a pill given to her by a friend for neck pain must have been methadone. (AR 375.) Dr. Luzius explained that further urine screening would have to be conducted and that Andler would not be prescribed any controlled medications if the tests revealed illicit substances. (*Id.*) Dr. Luzius noted that Andler was benefiting from her current medications, and he did not adjust her diagnoses or GAF score. (AR 375-76.) A urine toxicology screen conducted that day only tested positive for marijuana (AR 358-59), and Dr. Luzius subsequently continued Andler's prescriptions (AR 371, 373). Andler appeared to be doing better at these later visits (AR 369, 371, 373), though in December 2010 she complained of frustration and depression resulting from her attempts to get DIB and SSI payments (AR 369).

After a January 12, 2011 examination, Dr. Sunde reported that Andler had not attended a follow-up orthopedics appointment after her MRI was conducted. (AR 368.) When Dr. Sunde told Andler that she was responsible for following up with her orthopedics appointment and making sure he received her MRI results, Andler became agitated and said that she wanted to see another doctor. (*Id.*) Based on this encounter and Andler's previous toxicology results, Dr. Sunde opined that it was "high likely that substance-abuse is again active." (*Id.*) Andler remained angry when she visited Dr. Luzius later that morning, and he reported that she became "very defensive and reactive if she perceives anything that she interprets as criticism," though he added that she tended to modulate her distress after reflection. (AR 366.) At a follow-up appointment the following month, Andler claimed to be suffering from more depression, and she said that her motivation and energy had decreased. (AR 364.) Dr. Luzius added a prescription to target Andler's motivation and depression, seeking to stabilize both so that Andler could pursue

treatment for her hepatitis C at UNMH. (*Id.*) Andler subsequently followed up with UNMH regarding her MRI, and she was prescribed additional oxycodone after doctors determined that Andler was managing her shoulder pain well with that substance, shoulder injections, and physical therapy. (AR 424-25.)

In February 2011, Andler attempted to seek retail employment with the assistance of the New Mexico Division of Vocational Rehabilitiation. (AR 378-85.) She later testified that she found work on her own, without any help from that office. (AR 45.) However, the work she acquired thereafter only lasted a brief period (*see* AR 15, 41), and Andler expressed frustration with the slow economy in a March 2011 visit with Dr. Luzius (AR 362). Despite these continuing frustrations, over the next few months Dr. Luzius continued to report that Andler's depression and anxiety were stable and in partial remission and that Andler was doing well. (AR 362, 390, 397.)

Andler visited UNMH several times in late spring and summer 2011 for physical ailments. Notably, on June 20, 2009, Andler visited the emergency room with damage to her right pinky finger; the finger was sutured, and no medications were prescribed. (AR 406-15.) Although Andler apparently told doctors at UNMH that she slipped while walking and cut her finger when she grabbed a fence (AR 410), she informed Dr. Luzius one week later that she had closed a door on the finger "in a fit of anger" (AR 387). Dr. Luzius noted at the time that Andler was struggling with irritable moods and anger issues, which she attributed to difficulties with employment and financial support. (*Id.*) He described Andler as dysphoric and anxious on that visit, but with good insight and judgment and no cognitive impairment. (*Id.*) Andler's diagnosis was now listed as major depressive disorder with multiple stressors and anger as a coping

mechanism; however, Dr. Luzius continued to list Andler's depression as being in partial remission, and he did not adjust her GAF score. (*Id.*)

### HEARING TESTIMONY

On July 27, 2011, the ALJ held a hearing at which both Andler and a vocational expert ("VE") testified via video. (AR 34.) Andler was represented by an attorney. (*Id.*) There, Andler stated that her hepatitis C makes her feel tired all of the time and nauseated, and she said that she was taking Neurontin for her seizures, although her last seizure occurred about six months earlier. (AR 42-44.) Despite admitting to problems taking her medications in the past, Andler blamed this on the fact that she "wasn't really focusing on [her]self" at the time, and she claimed that she was now taking all medications as prescribed. (AR 44.) She testified that she gets upset "when people tell me what I should be doing and—just little stuff triggers everything"; she said that these frustrations started after her father died, when "people kept telling me to get over it." (AR 45.) She also believed that her depression and PTSD were keeping her from working full-time. (AR 46.) Andler admitted that she had been taking "pills and a little bit of cocaine" but that she had stopped using those substances six or seven months earlier. (AR 38.) She also denied any relationship between her seizures and her previous drug use, saying that she only went to the emergency room when she fell off her bicycle and that she was not on drugs at the time. (AR 47.) Andler conceded that she continues to use marijuana. (AR 40-41.)

Next, VE Judith Beard testified regarding Andler's past work history and future work ability. Having reviewed Andler's past work, the ALJ first asked the VE if, hypothetically speaking, Andler would be able to perform work if she were limited to understanding, remembering, and carrying out simple instructions; making simple decisions; attending and concentrating two hours at a time, "so on and so forth"; interacting "adequately" with coworkers

and supervisors and responding "appropriately" to changes in work setting; and various exertional restrictions. (AR 49-50.) The VE testified that although Andler would not be able to perform her past work with these limitations, she would be able to perform other jobs in the national economy, including work as an assembler, an electronics worker, and a laundry sorter. (AR 50.)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Andler's claim pursuant to the five-step sequential evaluation process. (AR 14-15.) After first determining at step one that Andler had not engaged in substantial gainful activity since her alleged onset date, the ALJ found at step two that Andler suffered from the severe impairments of left shoulder impingement, a history of seizure disorder, mild osteoarthritic changes of the left acromioclavicular joint, "depression/anxiety," hepatitis C, and a history of cocaine use. (AR 15-16.)

At step three, the ALJ concluded that Andler did not have an impairment or combination of impairments that met the criteria of listed impairments under Appendix 1 of the SSA's regulations. (AR 16-17.) As part of this analysis, the ALJ noted that Andler's mental impairments of depression/anxiety and a history of substance abuse did not meet the "paragraph B" criteria of that Appendix. (AR 16.) Specifically, the ALJ found only mild restrictions in activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, and pace; and no extended episodes of decompensation. (AR 16-17.)

Moving to the evaluation of Andler's RFC at the beginning of step four, the ALJ concluded that Andler possessed an RFC to perform light work provided that she was limited to lifting twenty pounds occasionally and ten pounds frequently; to standing or sitting for six hours in an eight-hour workday; to frequently pushing and/or pulling with her left upper extremity; to

only occasionally lifting overhead with her left upper extremity; to work allowing her to avoid "all exposure to hazards, heights, machinery, etc.[7]"; to understanding, remembering, and carrying out simple instructions; to attending and concentrating for two hours at a time; and to responding appropriately to work settings. (AR 17.) In doing so, the ALJ cited to Andler's hearing testimony, her function reports, and records from Dr. Luzius, Dr. Sunde, Dr. Simutis, the SSA's own medical sources such as Dr. Mellon, and UNMH medical providers such as Dr. Herekar, among others. (AR 17-25.)

The ALJ found Andler's statements as to the intensity, persistence, and limiting effects of her symptoms to not be credible to the extent that they were inconsistent with the assigned RFC. (AR 18.) Elaborating, the ALJ found "inconsistencies in the claimant's testimony and statements throughout the record when compared to the medical evidence of record," pointing to Andler's activities of daily living, the efficacy of her medication and treatment, and her statements regarding seizures and cocaine use. (AR 23-25.)

As to the medical evidence, the ALJ specifically adopted Dr. Mellon's narrative functional capacity assessment and his opinions regarding Andler's "paragraph B" restrictions, including moderate limitations on concentration, persistence, and pace, as "consistent with the overall medical evidence." (AR 22.) By contrast, the ALJ afforded "no weight" to Dr. Luzius's mental RFC assessment, including his finding of moderate to marked difficulties in Andler's ability to sustain concentration and persistence, stating that Dr. Luzius's opinions were "quite brief and conclusory, providing very little explanation of the evidence[,] . . . unsupported by the medical evidence[,] . . . [and] inconsistent with other substantial evidence of record." (AR 23.) The ALJ also afforded only "some weight" to Dr. Simutis's opinions, assigning "no weight" to

---

[7] Although the use of phrases like "et cetera" and "so on and so forth" at the hearing (*see* AR 49) may be permissible, I am troubled by the use of such vague words in the written RFC. If the Court adopts my recommendations, the ALJ should address Andler's limitations with more specificity on remand.

the extent that Dr. Simutis's opinion and GAF assessment were inconsistent with the overall medical evidence and the assigned RFC. (*Id.*) That said, the ALJ only specifically cited to Dr. Simutis's assessment of moderate limitations in Andler's ability to understand and remember instructions and her ability to interact with coworkers and the public, which were inconsistent with Dr. Mellon's opinions. (*Id.*)

Relying on the assigned RFC, the ALJ concluded that while Andler could not perform any of her past relevant work, she was able to perform other jobs that exist in significant numbers in the national economy. (AR 25-27.) In reaching this conclusion, the ALJ said that she had "determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (AR 27.) On this basis, the ALJ determined that Andler was not disabled under the meaning of the Social Security Act and not entitled to benefits. (AR 27.) Although Andler appealed this decision, submitting new records from the Indian Health Center from 2008 and 2009 for review (*see* AR 4), the Appeals Council found that her reasons for disagreeing with the outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner (AR 1-3).

**DISCUSSION**

## I.      The RFC and Mental Limitations

Although the ALJ found at step three that Andler possessed moderate difficulties in concentration, persistence, and pace, she did not expressly incorporate this finding in her RFC determination or her hypothetical question to the VE. Instead, the ALJ restricted Andler to understanding, remembering, and carrying out simple instructions and to attending and concentrating for two hours at a time. Andler argues that the ALJ's failure to incorporate her step-three determinations into the RFC constitutes reversible error. She also contends that this

omission invalidates the ALJ's hypothetical question to the VE at step five.

At step three, the SSA considers whether the claimant's impairments meet or equal an impairment listed in Appendix 1 of the SSA's regulations. 20 C.F.R. §§ 404.1520(d), 404.1520a(d), 416.920(d), 416.920a(d). In evaluating mental impairments, the SSA uses a psychiatric review technique "to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the 'paragraph B' . . . criteria of the adult mental disorders listings." Soc. Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (July 2, 1996) (citing 20 C.F.R. §§ 404.1520a, 416.920a).[8] These "paragraph B" criteria include "[a]ctivities of daily living; social functioning; [and] concentration, persistence, or pace," all of which are assessed on a five-point scale of "[n]one, mild, moderate, marked, and extreme." 20 C.F.R. §§ 404.1520a(c)(3)-(4), 416.920a(c)(3)-(4); *see also* 20 C.F.R. Part 404, subpt. P, app'x 1, § 12.00(C).

If the ALJ determines at step three that a claimant's mental impairments do not meet or equal an impairment listed in Appendix 1, she then assesses the claimant's RFC to determine the most work the claimant can still do despite her limitations. *Id.* §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8, 1996 WL 374184, at *7. The ALJ then applies this RFC determination to the claimant's past work history and future work ability to determine if she is entitled to DIB or SSI payments. *See id.* §§ 404.1520(e), 416.920(e). The SSA reminds adjudicators that

---

[8] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

> the limitations identified in the 'paragraph B' . . . criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph[] B . . . of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the [psychiatric review technique form].

SSR 96-8, 1996 WL 374184, at *4.

Notably, in only one published opinion has the Tenth Circuit touched on the relationship between a finding of limitations in the paragraph B criteria at step three and the RFC assessment. In *Frantz v. Astrue*, the Tenth Circuit remanded because the ALJ failed to fully discuss his decision to reject certain evidence and because he failed to make findings regarding the mental demands of her past work. *See* 509 F.3d 1299, 1302-04 (10th Cir. 2007). However, in a footnote, the court also briefly observed that the ALJ had found moderate difficulties in two paragraph B functional areas without including these limitation in his RFC determination, and it instructed the ALJ to address this "inconsistency" on remand. *See id.* at 1303 n.3.

Andler relies strongly on several unpublished cases that have addressed this issue in more detail. For example, in *Wiederholt v. Barnhart*, the ALJ found at step three that the claimant had mild to moderate restrictions in several functional areas, then proceeded to limit the claimant to an RFC of "simple, unskilled job tasks." *See* 121 F. App'x 833, 839 (10th Cir. 2005) (unpublished). The Tenth Circuit remanded the case, holding that "[t]he relatively broad, unspecified nature of the description 'simple' and 'unskilled' does not adequately incorporate the ALJ's additional, more specific findings regarding [the claimant]'s mental impairments." *Id.* Similarly, in *Griego v. Astrue*, the ALJ found moderate limitations in social functioning and moderate limitations in concentration, persistence, or pace, but he determined in the RFC that the claimant could concentrate for "up to 2 hours at a time with normal breaks," and he omitted any mention of limitations in social functioning in the RFC. *See* 10-cv-0974 WPL, slip op. at 15

(D.N.M. Oct. 7, 2011) (unpublished). The court remanded, relying on the *Frantz* footnote and noting that the ALJ had failed to explain the connection between his step-three findings and his RFC determinations. *Id.* at 15-17 (citing, *e.g.*, *Frantz*, 509 F.3d at 1303 n.3).

In the past year, however, the Tenth Circuit has provided unpublished guidance that minimizes the impact of the *Frantz* footnote and seemingly rejects the holdings in *Wiederholt* and *Griego*. In *DeFalco-Miller v. Colvin*, the court cited to SSR 96-8p's warning regarding the distinct nature of the step-three and RFC inquiries, and it noted that an ALJ's step-three finding "is neither a medical fact nor nonmedical evidence." *See* 520 F. App'x 741, 747 (10th Cir. 2013) (unpublished). In denying remand, the Tenth Circuit stated that "*Frantz* did not hold that an ALJ is necessarily bound by his or her step three findings when fashioning a claimant's RFC. And the court did not engage in any analysis on that issue." *See id.* at 747 n.5. The next day, a different Tenth Circuit panel observed that an "ALJ's finding of 'moderate difficulties' . . . in the 'paragraph B' criteria does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment." *See Beasley v. Colvin*, 520 F. App'x 748, 754 (10th Cir. 2013) (unpublished). Thus, the ALJ "was under no obligation to include limitations in social functioning in [the claimant]'s RFC based solely on his finding that she had 'moderate difficulties' in social functioning as part of the distinct step-three analysis." *Id.* In so holding, the court declined "to read this court's dicta in a footnote in *Frantz* . . . as requiring an ALJ's RFC assessment to mirror his step three-findings." *Id.* at 754 n.3. In *Suttles v. Colvin*, a distinct Tenth Circuit panel found the logic in these cases to be persuasive and agreed "that mental limitations noted in the threshold inquiry at steps two and three do not apply at later steps." *See* --- F. App'x ---, 2013 WL 5832529, at *2 (10th Cir. 2013) (unpublished) (citations omitted).

Although I am not bound to follow any of these unpublished decisions, *see* 10TH CIR. R. 32.1(A), I find the reasoning in the *DeFalco-Beasley-Suttles* line of cases to be persuasive. An RFC must rely on medical facts and nonmedical evidence, SSR 96-8, 1996 WL 374184, at *7, and as the Tenth Circuit observed in *DeFalco*, an ALJ's step-three findings are neither, *see* 520 F. App'x at 747. Moreover, because the paragraph B findings are wholly distinct from an RFC determination, it is not necessarily inconsistent to find that a claimant has moderate limitations in certain functional areas but can nonetheless perform certain tasks despite those limitations. *Cf. Beasley*, 520 F. App'x at 754 ("In this case, the ALJ found that, in spite of [moderate] limitations in social functioning, [the claimant] could 'respond appropriately to supervision, co-workers, the general public, and usual work situations.'") Accordingly, I agree with the recent line of unpublished Tenth Circuit cases and conclude that the ALJ's finding of "moderate difficulties" at step three in this case was distinct from an RFC finding and did not, by itself, obligate the ALJ to include congruent limitations in Andler's RFC.

Further, the case at hand is distinguishable from the remaining unpublished cases in important ways. For example, whereas the ALJ in *Wiederholt* used "relatively broad, unspecified" language in his RFC restrictions when failing to incorporate the relevant paragraph B findings, *see* 121 F. App'x at 839, here the ALJ used more specific restrictions involving Andler's ability to understand, remember, and carry out simple instructions and her ability to attend and concentrate for specific periods of time, *cf. Dannels v. Astrue*, No. 07-4122-JAR, 2008 WL 4191530, at *18 (D. Kan. Sept. 11, 2008). Likewise, the ALJ here assessed more detailed and specific RFC restrictions relating to concentration, persistence, and pace than did the ALJ in *Griego*, *see* slip op. at 15, and she explained why she did not include other restrictions

in the remainder of her RFC analysis and credibility findings. As such, I reject Andler's argument and find no error in the ALJ's RFC and subsequent hypothetical question to the VE.

In her reply brief, Andler seeks to distinguish her case from *Beasley* by also arguing, for the first time, that the ALJ's alleged omission was not supported by substantial evidence. As a general rule, courts will not normally entertain arguments raised for the first time in a reply brief. *See, e.g.*, *United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002); *United States v. Beebe*, 807 F. Supp. 2d 1045, 1054 (D.N.M. 2011). Still, this argument is easily addressed. As Andler concedes, "the ALJ [in *Beasley*] explicitly found that the claimant could respond appropriately to supervision, coworkers, and the general public in usual work situations, and . . . the ALJ's findings considered and reflected the moderate social limitations the ALJ found at step three." (Doc. 24 at 2 (citation omitted).) Similarly, the ALJ here expressly adopted Dr. Mellon's opinions regarding both Andler's moderate difficulties in concentration, persistence, and pace, and her ability to handle simple instructions and to attend and concentrate for two hours at a time despite these difficulties. Further, as the ALJ noted, Dr. Luzius frequently described Andler as having organized thought processes, good insight, and no impairment of cognition.[9] In other words, just as in *Beasley*, substantial evidence in the form of opinions from multiple acceptable medical sources supports the ALJ's finding that Andler could handle certain tasks regardless of any limitations in concentration, persistence, and pace. *Cf. Beasley*, 520 F App'x at 754-55 (finding that notes from the claimant's treating medical source and from a state agency psychologist were consistent with the ALJ's findings and constituted substantial evidence supporting those findings.)

---

[9] The ALJ gave "no weight" to Dr. Luzius's RFC assessment, a finding that Andler does not challenge despite her citation to that document in her reply brief. However, the ALJ did not expressly discount Dr. Luzius's other opinions, and she cited them frequently in assessing Andler's abilities and credibility.

Despite Andler's argument to the contrary, the ALJ's failure to expressly incorporate moderate limitations as to concentration, persistence, and pace in Andler's RFC was not reversible error and was supported by substantial evidence. As such, I recommend that the Court decline to remand on this basis.

## II.  Vocational Evidence

At the hearing, the ALJ asked the VE to give a description of Andler's past work and, given a hypothetical RFC, to determine whether Andler could perform any other work in the future. However, at no point during the VE's testimony did the ALJ ask whether the VE's testimony was consistent or in conflict with the Dictionary of Occupational Titles ("DOT"). Andler argues that a conflict exists between the hypothetical RFC posed to the VE and the jobs suggested by the VE as positions that Andler could be expected to work in the future. She also argues that the ALJ's failure to ask whether such a conflict existed requires remand.

At step five, the ALJ bears the burden to establish that there are jobs in the regional or national economies that the claimant can be expected to perform with the limitations assigned in the RFC. *See Thomas*, 540 U.S. at 25. Moreover, "regardless of what step is under evaluation, an ALJ has a duty to fully develop the record even when the claimant is represented by an attorney, as in this case." *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999). As such, "the ALJ must investigate and elicit a reasonable explanation for any conflict between the [DOT] and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability." *Id.*; *see also* SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000) ("When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. . . . If the VE's . . . evidence appears to

conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict."). On the other hand, when no conflict exists between a VE's testimony and job descriptions in the DOT, an ALJ's failure to inquire about potential conflicts is deemed harmless. *Poppa v. Astrue*, 569 F.3d 1167, 1174 (10th Cir. 2009).

Here, the ALJ summarily stated in her decision that "[p]ursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." However, the hearing transcript reveals that the ALJ did not inquire as to whether any conflict existed between the VE's testimony and the DOT. Accordingly, there is no evidence in the record to support the ALJ's finding that the VE's testimony was consistent with the DOT.

Of course, the lack of vocational evidence cuts both ways. As Andler points out, each of the three positions cited by the VE—assembler, electronics worker, and laundry sorter—requires a reasoning level of two. *See* Dictionary of Occupational Titles, at 361.687-014, 706.684-022, 726.687-010 (4th ed. 1991), *available at* https://www.oalj.dol.gov/LIBDOT.HTM. At this reasoning level, a worker should be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions[] [and] [d]eal with problems involving a few concrete variables in or from standardized situations." *See id.* app'x C. Andler argues that the RFC restricting her to handling only "simple instructions" is more in line with a reasoning level of one, where a worker is expected to "[a]pply commonsense understanding to carry out simple one- or two-step instructions[] [and] [d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *See id.* However, the record does not contain sufficient vocational evidence by which the Court may determine whether there is a conflict between Andler's RFC and a reasoning level of two, and neither the parties, the ALJ, nor

the Court are vocational experts who are qualified to determine if this is the case. *See Morris v. Colvin*, Civ. A. No. 12-2057-JWL, 2013 WL 1729007, at *4 (D. Kan. Apr. 22, 2013) (unpublished).

That said, I agree with Andler that there is a *possible* conflict between the VE's testimony and the DOT. In *Poppa*, the Tenth Circuit determined that there was clearly no conflict between an RFC requiring "slightly below normal" hand dexterity and a job calling for manual dexterity found in the "Lowest 1/3 [of the population,] Excluding Bottom 10%," and a "Low Degree of Aptitude Ability." *See* 569 F.3d at 1174. As such, the ALJ's failure to determine whether such a conflict existed was harmless. *See id.* By contrast, the consistency between an RFC allowing only "simple" instructions and job descriptions calling for "commonsense understanding to carry out *detailed but uninvolved* written or oral instructions" (emphasis added) is not apparent. This is especially true when a lower reasoning level specifically calls for "commonsense understanding to carry out *simple one- or two-step* instructions" (emphasis added), which would appear to align better with Andler's RFC. *See Scheibeler v. Astrue*, Civ. A. No. 08-cv-01643-WYD, 2009 WL 3077310, at *2-3 (D. Colo. Sept. 21, 2009) (unpublished) (remanding where an RFC for "routine and repetitive tasks and instructions" was not apparently consistent with the VE's recommended jobs requiring a reasoning level of two or higher); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (remanding where an RFC for "simple and routine tasks" appeared to be inconsistent with the VE's suggested jobs requiring a reasoning level of three). While it is possible that Andler's RFC may be reconciled with jobs requiring a reasoning level of two, the Court is not positioned to make this determination without additional vocational evidence. As such, I cannot accept the Commissioner's conclusory argument that the ALJ's failure to inquire into any conflict between the VE's testimony and the DOT was harmless error.

Further, despite the Commissioner's citation to caselaw from other circuits, the holding in *Haddock* is clear: in the Tenth Circuit, the ALJ operates under an affirmative obligation at the hearing to inquire whether and to what extent a VE's testimony is inconsistent with the DOT before relying on that testimony as substantial evidence of nondisability. *See* 196 F.3d at 1091; *see also id.* at 1088 (recognizing that the ALJ bears the burden "to produce or develop vocational evidence at step five"); SSR 00-4p, 2000 WL 1898704, at *4. Given this mandate, and given the lack of sufficient vocational evidence to resolve the apparent inconsistencies that Andler highlights, I conclude that remand for rehearing is required so that any such inconsistencies may be addressed and reconciled. Accordingly, I recommend that the Court grant Andler's motion to remand so as to resolve the ALJ's step-five error.

CONCLUSION

The ALJ did not err by failing to expressly incorporate moderate limitations as to concentration, persistence, and pace in Andler's RFC. However, the ALJ's reliance on the VE's testimony without "investigat[ing] and elicit[ing] a reasonable explanation for any conflict between the [DOT] and expert testimony" was erroneous and requires remand. As such, I recommend that the Court grant Andler's motion to reverse and that it remand this case to the SSA for proceedings consistent with these proposed findings.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.